Yes, Your Honor. If I could reserve two minutes, I would appreciate that. Thank you. All right. I'm Stephen Larson on behalf of the Mosafer plaintiffs, counter defendants, and cross appellees, collectively the Mosafer parties. Your Honor, obviously the questions that the court has, I'll stop immediately. But I'd like to begin with the anti-SLAPP motion that the district court, we believe, erroneously granted adverse to our clients. And specifically the issue is that the district court erred in granting the anti-SLAPP by requiring the Mosafer plaintiffs to introduce evidence to invoke the illegal conduct exception at step one of the anti-SLAPP analysis. It's well established in California law that we have this two-step process for anti-SLAPP. It's well established that the anti-SLAPP statute itself excludes the legal conduct. While it's a broad statute and it covers a lot, what it does exclude is illegal conduct. And I don't even think the appellees in this case are challenging the FARA statute. It's a criminal statute, and this isn't just illegal conduct. This is specifically criminal conduct. That is not protected by the anti-SLAPP statute. We have alleged in our complaint, and we alleged at length in our complaint, that the conduct was not just illegal, but it was criminal. It was in violation of the FARA statute. So then the question becomes, what standard should be applied at the anti-SLAPP stage, both for step one and for step two? What the district court did is took the Farley case, the Flatley case from California, and essentially imposed on the plaintiffs, both at step one and step two, an obligation to produce evidence. This court now has repeatedly held, most recently in the case that we provided with supplemental authority, that not only is that not required, but that it's expressly improper. The case that we submitted after the filing of the re-applied briefs, the gun case. I'm sorry, the gun versus drugs. The court of appeals, this court specifically held that, quote, this is at page 1120, we clarified that to eliminate conflicts between California's anti-SLAPP laws, procedural provisions, and the federal rules of civil procedure, courts must review anti-SLAPP motions to strike under different standards depending on the motion's basis. The court goes on, if a defendant moves to strike on purely legal arguments, which is exactly what the case is we have here, this was not a motion for summary judgment, this was not a motion to attack the facts, courts must analyze the motion under rules 8 and 12. But where a defendant asserts a factual challenge, courts must treat the motion to strike as a motion for summary judgment triggering discovery. There was no discovery here, there was no opportunity to bring forth evidence. The district court offered several reasons for why this wasn't covered. Why the alleged illegal unlawful prong of California's unfair competition law was not. But what it didn't address, Judge Paius, was it didn't address the legal allegations which by themselves were sufficient for purposes at this essential 12B stage. Well, but I thought under California law for the unfair competition, unlawful prong. Oh, certainly, and I'm happy to go there. There's no question that there were actually six different challenges to the UCL claim, and they were all legal challenges. And so my only point, and maybe I'm belaboring the point at this point, that the anti-SLAPP was improperly granted because the burden that was imposed upon the plaintiffs was to come forward with evidence of illegality. And we don't need to do that. That's clearly established under California law. The court did go after and withdraw the UCL claim, which I think was improper as well, because we do state a valid UCL claim. And essentially there were six different reasons why the court addressed it and threw it out. And first of all, there was this issue of the private right of action. But the California Supreme Court has expressly affirmed that the UCL provides a remedy even where the underlying statute confers no private right of action. That's just flatly wrong in terms of the argument that we do not have standing because there's no direct harm. That, too, is not accurate. We did clearly claim, and our claim is not just on the singular newspaper ad that ran in the Washington Post, which the district court cited, but rather the entire disinformation conspiracy that defendants orchestrated on behalf of the United Arab Emirates. The complaint repeatedly alleged that the disinformation conspiracy caused hundreds of millions of dollars of damage to Mocifer, and that the publications appeared to be legitimate. It was never disclosed that they were in fact propaganda. This is the whole FARA illegality aspect. So the Mocifer parties were never specifically mentioned in any of the statements, were they in Mocifer products? That's correct. Were they? They weren't, Your Honor. And that's part of it. This was a very sophisticated, very clever campaign. And what it was was it was directed first and foremost at the government of Qatar, but it was designed and set forth to basically destroy Qatar and everyone who was supporting Qatar economically. And our client was in the travel business, and literally hundreds of millions of dollars were at stake in the travel, in the transportation, in the hotel. And by falsely casting Qatar as this terrorist country, this terrorist organization, this terror-ridden place it had, and by design it was aimed at destroying our client's business on behalf of the UAE, which is a competitor tourist destination in the Middle East. And while it didn't mention it by name, that is not a requirement. The elements are clearly established that it is a business practice, and this was one of the other issues that the court raised, is whether or not it was a business practice. And clearly it was. It was designed to achieve the economic effect. There's no question that there's political overtones here. But just as we have a dumping case, say, out of China, for example, if China is dumping steel in the United States, that is a business practice. It may very well be that there are political reasons behind that as well. There may be geopolitical implications of it. These are not mutually exclusive. What you had here was an effort to destroy Mocifer in businesses like Mocifer to the benefit of other businesses doing business and supporting the UAE. This was clearly an economic and business effort. And that's what's alleged. Discovery may pan out differently, and that's kind of the point of how these two things are connected. We're at the toe of these states. We have clearly sufficiently alleged illegal conduct. This is a FARA violation. Mr. Broidy himself pleaded guilty in an unrelated case to a FARA violation, to a criminal case. So this is not some far-fetched notion. This is proven, demonstrated conduct, and we believe it's at work in this case here. And those are the allegations. Those are the allegations that the district court was required to treat as true and accept as true for purposes of both the anti-slap motion and the 12B motion, and it failed to do so. There's also this argument that the commercial conduct is exempt from FARA. As we set forth in our briefs, FARA does not exempt individuals such as lobbyists who engage in political speech as part of a business practice. And that's what was going on here. Sure, the Washington Post ad may have been a, can be characterized as political speech. But the purpose of that ad, as we allege, was part of an overarching campaign of disinformation that had a clear economic slash business slash commercial purpose. And it's that using political lobbyists and using political instrumentalities in violation of FARA, which is the means of this unlawful business practice. And that is what triggers the appropriate application of the UCL. The court also made arguments or found persuasive this notion that there's an absolute bar to private enforcement. But if you look carefully at the case law on this, specifically the Rose versus Bank of America case out of California Supreme Court in 2013, the existence of a separate statutory enforcement scheme does not preclude a parallel action under the UCL. I think it's the Nader appellants who cite to the Hartless versus Clorox case. But the Hartless case was based on a Section 1983 action that was being used to enforce FIFRA. And the California Supreme Court has expressly addressed that. And they addressed it in the Rose case and found that the rationale does not apply to claims brought under the UCL. And these are, you know, certainly if Congress passes a statute and uses language which expressly bars any other action, that would trump certainly the UCL claim. But that's not what you have here and the California Supreme Court has clearly indicated that those cases that the appellants are relying on in this instance do not warrant. And the final argument was that somehow that this meddles in our foreign policy and that's certainly not the case at all. There is nothing about this lawsuit which meddles in foreign policy. There's nothing which in any way impacts foreign policy. This is a business that was targeted by the defendants in this case. It was targeted by people that the defendants were acting on behalf of. And it is all about business and economics. And the UCL claim was improperly dismissed at this stage. And I would say the same thing is true, of course, of what was labeled as the trade libel, which is really a false statement claim. And I'll be the first to concede that it was probably imperatively labeled as a trade libel claim. But in substance and in essence, this is a classic false statement claim that is recognized under California law. We allege the elements that are required under California law. There's four of them, that there be a publication of a false statement that causes pecuniary harm to another, with three, the intent to cause harm, and four, knowledge that that statement is false. Those are the four elements, and all four elements are clearly laid out in the complaint. The complaint alleges that the defendant published a full-page advertisement in the Washington Post asserting that Qatar is a safe haven for terrorists. These false statements caused pecuniary harm to our clients. The complaint alleges that the goal of the misinformation campaign  And lastly, the defendants knew that their statements were false. How that plays out over the course of discovery, that's what discovery is for. But at the 12B stage, those allegations are more than sufficient to establish a false statement claim under California law. So in sum on those, and I see I'm down close to three minutes, and I haven't even gotten to the response to their appeal, but most importantly to us at this point, the anti-slap motion was just wrongly granted in this instance. Clearly the wrong standard. Both the UCL and the false statement claims are viable. They state the elements. They clearly track California law. Those should all be restored at this point. As far as the claims, we do believe that the anti-slap motion was properly addressed by the district court with respect to their claims. And frankly, the abuse of process claim that they brought against us, it all comes down to that complaint. The litigation privilege, I don't need to explain to this court how the California law views the litigation privilege. It is darn near absolute, and it certainly applies to the filing of a complaint. The Virginia business conspiracy, they conceded that two of the three parties, it doesn't apply to. The third party is nothing more than another entity of Mr. Brody, which happens to be incorporated in Virginia. Clearly the conflicts of law analysis favors California, and as the district court found, there's no place for this Virginia business conspiracy statute when California itself has its own business conspiracy statute. And the RICO is just too far afield, and the court in each of the instances addressed those correctly. I've got a minute and 22 seconds left, but to reserve that. I'll give you two minutes. Thank you very much. Thank you. Thank you, Your Honors. We will next hear from Ms. Forrest Ford George Nader. Good morning, Your Honors. My name is Courtney Forrest. I represent Defendant Appellant George Nader. Mosifer claims that the federal rules only require Mosifer to plausibly allege that defendants' conducts were illegal and therefore are not subject to antislap protection. This is plainly contrary to the holdings of this court as well as the California Supreme Court, which has held that unless the conduct is conclusively shown or admitted to be illegal, the defendant is still entitled to invoke the protections of the antislap statute. Mosifer's arguments fundamentally confuse the standards that apply to a threshold determination of whether a narrow exception applies that bars a defendant from bringing a motion to strike at all with the standards that apply to the evaluation of plaintiff's probability of success on its claims. And the illegal speech exception does not conflict with the federal rules because it never changes plaintiff's burden to show a reasonable probability of success on its claims. Here, Mosifer's claims are not for a violation of FARA. Their claims are for a violation of the UCL or for trade libel or injurious falsehood. So the district court properly struck those claims because the theory that Nader violated FARA was insufficient to trigger that exception, and the claims then fail as a matter of law in Step 2 of the antislap analysis. So the district court's orders should be confirmed. Now, procedural state laws such as the antislap are used in federal court unless doing so would present a direct collision with the federal rules of civil procedure, which was reaffirmed in Planned Parenthood. And here, there's no direct collision with respect to the illegal speech exception. The conflict only exists if plaintiff is required to produce evidence to support for claims without an opportunity for discovery. Here, the district court did not require that. Mosifer says over and over that the district court required them to produce evidence. That's not the case. They were invited to do so if that evidence exists. So if there were conclusive evidence of illegality, such as a plea agreement, a criminal fine, a conviction, that's an alternate path for the plaintiffs to defeat an antislap motion, but it never changes their burden under the ordinary antislap analysis. So because Nader brought only a legal challenge, they could still defeat the motion if they were able to show that their claims were sufficiently pled, which they were unable to do here. Because the illegal speech exception never increases the burden on the plaintiffs, there's no conflict here. They also argue that they were entitled to discovery under Planned Parenthood and hearing networks, and that's also incorrect. So plaintiffs are entitled to discovery in an antislap analysis in two circumstances. The first is if defendants challenge the factual sufficiency of the evidence, and the second is if defendants introduce their own evidence at step one, and Nader has done neither. So Planned Parenthood and hearing networks hold that the plaintiffs are not required to and indeed cannot be obligated and are not permitted to introduce evidence in response to purely legal challenges. The Gunn case, the Gunn v. Drage case, that they raised as supplemental authority, didn't change that analysis. That only clarified that when defendants purport to bring a legal challenge but then introduce evidence at step one in support of their prima facie showing that their conduct is constitutionally protected, that will then trigger a discovery obligation because it's essentially converting the motion to one for summary judgment. But Nader has not done that. He brings a pure legal sufficiency challenge. He has not introduced evidence at step one, and therefore plaintiffs are not entitled to discovery. No court has held, and this court should not be the first, to hold that plaintiffs can transform a legal challenge to a factual one merely by alleging that the illegal conduct exception applies. So turning to the UCL claim. The UCL claim fails as a matter of law for a number of reasons, regardless of whether a violation of FARA is possibly alleged. So first is that the conduct alleged is not a business practice. I don't even think this is a close question. The UCL only allows recovery for unfair, unlawful, or fraudulent business acts or practices. And as the district court correctly noted below, the UCL is a consumer protection law that's not designed to protect Mocifer parties from the kinds of injuries sustained here. Mocifer has essentially conceded that the practices underlying its claims are political and not commercial. So they admitted below that all of the communications and the publications at issue, none of them proposed commercial transactions. And FARA, they've also admitted, requires registration by persons who are conducting political activity in the U.S. on behalf of foreign principals. The Northern District of California once summarized the unfair competition law as saying that it's historically concerned with wrongful conduct in commercial enterprises designed to draw customers away from a competitor. We don't have that here. We have statements that are made about an entire country and precisely about the political activities of a certain country. That is simply not a business practice. My question is why this failure to follow FARA's registration rules, why is the question about whether that's a business practice not a question of fact that's not really susceptible to motion, to dismiss? Isn't that a question of fact? No, I don't think it is, Your Honor. I think if you look at all the cases that are discussing business practices, they're engaged with commercial activity. And so FARA is designed a registration of political activity. And so political activity, as we all know just from our everyday experience, can have economic consequences. That's often why you hear that elections have consequences, right? Like depending on an administration that's in power, that can have a consequence for a business. But that doesn't mean that all political activity is therefore a business practice. And that's the only sort of connection that the plaintiffs have tried to draw here. The UCL claim is also legally invalid because FARA contains an absolute bar to private enforcement. And the UCL claim can't be based on an alleged FARA violation. Most were discussed the Rose case. And that they're making, they've misread that case. So Rose involved a statute, the Truth in Savings Act, that had a savings clause. And that savings clause explicitly approved the enforcement of state laws relating to the same subject matter. So Congress expressly left the door open for the operation of state laws that hold banks to standards equivalent to those of the TISA. And that's at page 327. So Rose did not overturn the holding in Almond Hill that when there's an intent to foreclose private remedies, that can be inferred when the remedial devices in the statute are sufficiently comprehensive like you have in FARA. You have a very comprehensive enforcement scheme of both civil and criminal penalties. You have enforcement designated explicitly to the Attorney General. And I think it's very telling that most of her cannot cite a single case holding that a FARA violation has been sufficient to base a UCL claim. FARA was passed in 1938. The UCL was passed in 1977 and amended in 1992. So depending on which of those dates you use, that's either 46 or 31 years. And in those multiple decades, it appears that a FARA violation has never been held to be the basis for a UCL claim. So now, a retrieval of a claim. Most of her did not at all address the statute of limitations in their argument, and the claim is clearly time-barred. So the district court correctly noted that the statute of limitations runs from the date plaintiffs knew or should have known that it sustained an injury. It pled in the complaint that it was aware of its injury in mid-2017 and had to take countermeasures. They specifically pled they had knowledge of articles and posts about Qatar that were, quote, wallpapered across the Internet that they believed to be false and they perceived it was hurting their business. So they believed at that point someone was publishing injurious falsehoods, what they claim are injurious falsehoods, about them. So the statute of limitations should have run from that point. But even if you apply the discovery rule, as most FARA users said, the district court still correctly found that those claims are time-barred. So in 2018, the most FARA plaintiffs pled that there was a New York Times article and various other articles in national publications specifically alleging that Mr. Nader and Mr. Brody were engaged in activities on behalf of the UAE and designed to harm Qatar. They are trying to avoid a statute of limitations bar by saying, while they didn't plead that they actually read those articles, but they have pled that they were keenly aware of every other news article being published about Qatar because it was hurting their business. And they have not pled how they became aware of the causes of their, the basis for their causes of action if not for that news article. And in addition, even if they were not actually aware of them, that's not the standard. The standard is if a reasonable person would have been on inquiry notice at that point, and they certainly should have been. And then on the merits of the claim, even if it's not time-barred, they have failed to allege, and they cannot allege, that any of the statements were specifically about them or even about their industry, about luggage retailers, about travel. The California state law requires that an element for a claim for injury is falsehood. Specifically refer to the plaintiff's product or business and derogate it. The district court cited the Hartford casualty case, which in turn cites the Blatty v. New York Times case. They admit that not a single one of these statements referred to them or their industry. I'm out of time. Thank you very much. We'll hear from Daniel Benefin for LAPRD. Actually, Daniel Saunders. Oh, I'm sorry. That's fine. For LAPRD Capital Management. Well, it's for all the Blatty colleges. We're jointly representing Mr. Blatty, Blatty Capital Management, and Sir Sinus. And just to be clear, I'll be addressing the Mosifer appeal and the Cross appeal as against Mosifer. Mr. Benson will be addressing the Cross appeal as it relates to the dismissal of the counterclaims against Cutter. Very well. Thank you. Thank you. And may it please the Court, Daniel Saunders, on behalf of the Blatty parties, I'd like to reserve one minute of time for rebuttal. And let me start by following up with what Ms. Farr said about the Planned Parenthood argument that Mosifer makes and Mr. Larson made. Planned Parenthood, from this Court, dealt only with step two of the anti-SLAPP analysis. That's the reasonable probability prong where it is the plaintiff's burden to show that the claims have merit. And under Planned Parenthood, this Court just simply said, when you're dealing with that statute in federal court, you have to have parity, that reasonable probability showing is equivalent to a 12 v. 6 showing, and that was to avoid a conflict between state and procedural rules. That had absolutely nothing to do with step one of the anti-SLAPP analysis, where it is not the plaintiff's burden to show anything. That has the burden on the defendant, not the plaintiff, to make a prima facie showing that the speech at issue is constitutionally protected. That doesn't impose a burden on the plaintiff to come forward with evidence. The district court didn't impose a burden on the plaintiff to come forward with evidence. It's the defendant's burden to make the threshold showing that the statute applies. And the California Supreme Court and this Court in Safari Club recognized a narrow exception where the plaintiff cannot make that prima facie showing if the defendant has already admitted, or there's some uncontroverted evidence, that the speech is illegal. So it has nothing to do with the plaintiff making an evidentiary showing or an evidentiary hearing. It's a limited exception that prevents the defendant from invoking the statute and meeting its burden on step one if there is an admission or uncontroverted evidence. Most of them would effectively have this Court overrule Safari Club, which of course one panel of this Court can't do, and hold that as long as a plaintiff alleges or plausibly alleges that the speech was illegal, that alone is enough to remove the claim from anti-SLAPP scrutiny. But that has never been the law. It is not the law. They don't sign a single case saying that it is the law, and it's just a lot of smoke and mirrors. But the second reason that Mosifer's argument fails is that even if there were some undisputed evidence of a FARA violation, which there clearly wasn't, that wouldn't affect prong one because a FARA violation does not make the speech at issue illegal. It's the Foreign Agents Registration Act. It's a failure to register. It doesn't prohibit or criminalize any publications or any speech. It simply requires that information be made available to the public so that the public can assess that speech in light of the speaker's associations. There is no such thing as illegal speech under FARA. It's not like obscenity or extortion or other speech that has been recognized as unprotected, incitement. And the Supreme Court specifically recognized in the Reese v. Keene case in 1987 that FARA, quote, places no burden on protective expression. So again, Mosifer doesn't set a single authority holding that the illegal speech applies to otherwise constitutionally protected speech based on the speaker's failure to register under FARA. As far as the UCL claim, this is the classic effort to get a square peg into a round hole. It's an unfair competition statute. Mr. Brody has a cell luggage. Mr. Brody isn't involved in the travel business. Mr. Brody is not a competitor in any way of Mosifer. Mr. Larson spoke very broadly and, again, I think just tried to confuse the issues about, well, this had impacts on tourism and that's somehow a business practice. For an unlawful prom UCL claim, it is the alleged unlawful conduct that has to be a business practice. A failure to register under FARA is not by any means a business practice. And in response to your question, Judge Thomas, I think that is a question of jurisdictory interpretation that is proper for the court to address. And, again, the speech itself, which is what Mosifer is complaining about, would not be illegal even if there were a FARA violation. So with respect to Mosifer's appeal, again, there's just not one case that they cite. They have over 120 pages of briefing they've submitted to this court. Not one case in which a court has denied an anti-SLAPP motion at step one based on a mere allegation of illegal conduct. Not one case in which a court has found speech constitutionally unprotected based on a FARA violation. Not one case in which a court has found a FARA violation conservative as the predicate for an unlawful UCL claim. And with respect to this injurious falsehood or trade libel or whatever they want to characterize it as now, not one case in which any court has found that such a clause of action can be based on general political speech about a country or its policies that says nothing whatsoever about the plaintiff. So the district court was clearly acting properly in dismissing Mosifer's complaint. It is a textbook example of the type of complaint that the anti-SLAPP statute was designed to strike in an early stage. It's a complaint that sought to punish American citizens for political speech, taking a stand against Cutter's sponsorship of Hamas and other terrorist organizations, and further sought to enjoin them from any negative speech in the future. Classic, bigly unconstitutional prior restraint. The Cutter claims, in contrast, focused on protecting the First Amendment rights of U.S. citizens to engage in political speech in the public forum without being targeted and hacked and smeared by a foreign state and its proxies. A state that's not even willing to sue in its own name, but instead perpetrates a fraud on the judicial process through the use of sham proxies. So to the extent that a district court sort of took a pox on both your houses approach and got rid of everything, we're nowhere near constitutional parity here, and we're nowhere near parity on the statement of claims. I'll just address briefly, and then I'll save for rebuttal. With respect to the abusive process counterclaim, the district court apparently misconstrued the word process as used in that claim. When it stated that the party failed to identify any process or accusing process that could be the subject of that claim. Process for abusive process is not limited to a pleading or a complaint or some type of written document in the sense of a process server. It refers to the entire panoply of procedures in the judicial process. And there was clearly sufficient allegations accepted as true in the Cutter claims that most of her parties abused that process to achieve an improper purpose, which was specifically to silence and punish American citizens for their political speech while effectively defrauding the court by hiding the real party of interest in order to preserve their sovereign immunity claim. With that, I'll reserve my maybe 30 seconds, or if the court will grant me a minute. We'll give you a minute. I'll turn it over to Mr. Benson. Thank you very much. Okay, Mr. Benson. Thank you. Thank you, Your Honor. May it please the court, Daniel Benson for the Brody Parties. Your Honors, there's been discussion of the legal technicalities of the Anton Slap Law and other issues. I think it's plain that, as a matter of law, the claims that most of her has brought fail miserably. And I think it's plain that, as a matter of fact, the complaint makes no sense. It's plain that this is a sham lawsuit that has been brought in order to retaliate against Mr. Brody, who's been a prominent critic of Cutter's support for terrorism, including its support and harboring, we see it on our television screens as we speak, harboring of Hamas terrorists. And this retaliation, they retaliated with a hack and smear campaign, and this is, as we allege in our counterclaims against Cutter, this lawsuit is part of that campaign. Cutter may not be entitled, it would be entirely unfair and unjust to allow Cutter to do what we allege they're doing. And, frankly, it's plain, I think, from the facts that we see in front of us that they're doing, to rely on sovereign immunity here and evade Mr. Brody's right to assert counterclaims against it. The Supreme Court sent in the Republic of China case in 1955, and that's the case that Congress codified in the counterclaim exception. We have a foreign government invoking our law but resisting a claim against it, which would clearly curtail its recovery. It wants our law like any other litigant, but it wants our law free from the claims of justice. You know, this case is actually far worse. Cutter doesn't want our law like any other litigant. He wants to abuse our legal system to wage lawfare with impunity against its critics. Let's step back and look at what's happening here. A luggage store in Manhattan, suits a California resident, not because he criticized the store or anything to do with the store, but because he criticized Cutter. Their entire complaint is predicated on criticism of Cutter. And in bringing this case, Mussover just happened to use information that could only have been gleaned, as we allege, from John Doe lawsuits that Cutter did file through his fire at registered counsel. Of course, John Doe's cannot file counterclaims, and they use those lawsuits to serve subpoenas and obtain information that was used in this complaint. And then it publicized the filing of the complaint to recycle the smear that it had already conducted and had been conducting against Mr. Broidy. And then it used Cutter's fire at registered public relations firm to do that. Mussover's supposed damages, hundreds, to quote the complaint, hundreds of millions of dollars on a global scale, whatever that means, are predicated entirely and exclusively on criticism of Cutter. And this is when Cutter's official statistics show that tourism to Cutter was steadily increasing during this period. Cutter argues that Mussover could only bring claims on its own behalf. But that ignores the allegations of the counterclaims and, again, the plain reality staring us in the face. This is a sham lawsuit not to recover any damages suffered by Mussover. It was filed at Cutter's direction as part of its campaign against Mr. Broidy and other critics of its support for Hamas. Again, Your Honors, Mussover alleges not that Mr. Broidy or anyone else damaged them directly. Mussover does not allege that Mr. Broidy said one word about Mussover, only about Cutter. Mussover alleges only that Mr. Broidy's criticism of Cutter harmed it. In his counterclaims, Mr. Broidy alleges that Cutter illegally sought to silence and punish him for that very same criticism. Moreover, Cutter alleges, for example, that Mr. Broidy's criticism of Cutter was instigated by Cutter's regional rival, the United Arab Republic, the UAE. As Mr. Broidy, as we allege in our counterclaims, Cutter's hack and smear campaign against him was very similar to and was carried out by the same ex-CIA black ops people who carried out Cutter's global leaks, hack and smear campaign against UAE's ambassador to the United States, which was also aimed at deterring and silencing Cutter's critics. There's no question that given Mr. Broidy's allegations, the allegations in the complaint, and again the reality staring us in the face, the claims and counterclaims arise out of the same transaction or occurrence, which the Supreme Court has made clear is a flexible, and other courts have made clear is a flexible standard, and certainly Congress could not have intended to exclude counterclaims against a country like Cutter. Your Honor, I'd like to reserve two minutes for replying, if that's okay. Thank you. Thank you. We'll now hear from the State of Cutter. I'm going to get it wrong. Zions. Zions, yes, thank you, Your Honor. If Your Honor, may it please the Court, David Zions on behalf of the State of Cutter. I have three main points that I'd like to cover. First, the counterclaim exception to the FSIA only applies to an action brought by a foreign state bringing a claim of a foreign state. As a matter of plain text, this lawsuit was not brought by a foreign state, and it is not and cannot be advancing the claim of a foreign state. Common law agency principles are not relevant to this exception. Second, even if they were, the complaint does not adequately plead that the Mocifer parties were acting as a common law agent filing a lawsuit on behalf of the State of Cutter. Third, even if this could be treated as an action brought by a foreign state, Broidy's counterclaims don't arise out of the same transaction or occurrence as the claims that were initially brought by Mocifer. Your Honor, turning to the first point, the claim of a foreign, that this has to involve the claim of a foreign state, you heard earlier, I think Mr. Benson was making the point that Mocifer wasn't injured, that there's no relationship between Broidy and Mocifer. Judge Thomas, you asked the question to Mr. Larson earlier. Was Mocifer actually mentioned or targeted specifically? And the answer to that colloquially may well mean that the Mocifer parties don't have a claim. If they want to stand in U.S. court and bring a claim that they need to be injured themselves, they need to meet the elements of the claims as to them. But it is a fundamental legal impossibility for them to be advancing the claim of the foreign state. Federal Rule of Civil Procedure 17 says an action must be prosecuted in the name of the real party in interest. But in the district court, Mr. Broidy did not move to dismiss the claim, the Mocifer claims in the ground that the Mocifer parties were the real parties in interest. Instead, they said the Mocifer parties weren't injured. You know, all of these reasons that you've heard again. Today, we're not here taking the position one way or the other on that, but they are engaging on the question of whether the Mocifer parties can bring a claim. This is not a claim of a foreign state, so it can't fall within the exception by its plain text. The plaintiffs have really almost exclusively relied on this court's decision in Sachs, which involves the commercial activity exception and the question of whether commercial activity by an agent is commercial activity carried on by a foreign state. In the United States, you have a fundamental different type of conduct where an Austrian state railway, it could send an employee to a ticket office in the United States and sell tickets there, or it could engage an agent to sell tickets. And the ticket is being sold on behalf of the Austrian state railway. When it is presented, it is being honored at the Austrian state railway. It is in every meaningful sense. This is how entities do business through agents when they're selling tickets. That's how the Austrian state railway was doing it. So it's very natural to say that is commercial activity carried on by the foreign state. The situation with lawsuits is entirely different. It is a legal impossibility for a common law agent to bring an action on behalf of a foreign sovereign. With very limited exceptions, lawsuits have to be brought in the name of a real party in interest. If Mr. Brody had filed a motion to dismiss saying that the most for parties are not the real party in interest, that could have been a basis for dismissing the case. But fundamentally, unlike commercial activity, it is not possible to engage in litigation through common law agents. Turning your honor to the question, even if you set that aside, do the alleged common law agency, the restatement of agency, which this court has followed, focuses on direction, control, and this critical question of on behalf of. It is not enough to say X directed Y's conduct, ask Y to do something, even exercise some degree of control. There has to be assent to acting on behalf of the principal. As we just discussed, it's really not a legal possibility here. But even setting that aside, when you read the counterclaims cover to cover, you have very long sections talking about personal relationships between families, business connections. You have some fairly gratuitous broad-brush criticisms of how power structures work. In Cutter, you don't actually have any allegation that goes to direction of the most for parties, whether directly or through the Abueza brothers, in filing this lawsuit, much less a set agreement by either the alleged principal or the alleged agent that a lawsuit would be filed on behalf of the state advancing the claim of the foreign state. Your honor, the third fundamental problem here, and in some ways it's maybe the most straightforward and doesn't require, you know, on this foreign state question, you know, Mr. Brody is asking the court to do something unprecedented and treat an action brought not by a foreign state as brought by a foreign state. There's actually a more direct precedent on this question of same-transaction occurrence. I agree it is a liberal standard. It is not a limitless standard. This court is often focused on the essential facts. Do the essential facts of the claims really relate to the essential facts of the counterclaims? As Mr. Brody in his brief, the main case that he relies on is a Supreme Court decision called Moore v. New York Cotton Exchange. He quotes over and over this one sentence about the one circumstance without which both parties, you know, wouldn't have come to the court. The next sentence after that says, essential facts alleged by appellant enter into and constitute in part the cause of action set forth in the counterclaim. There is real factual overlap between the claim that was made and the counterclaim that was then brought. The Second Circuit applying the counterclaim exception in Kibera v. Republic of Ghana, you know, did that exact analysis. One of the claims there, you know, the court found it involved the same fundamental factual issues about the alleged breach of an employment agreement. That led to an eviction dispute. It also led to a breach of contract dispute. But the essential facts were really overlapping. A number of other counterclaims that were brought where the counterclaimant said, well, there's a number of other kind of broader sets of wrongdoing that was alleged in a more general, linked in a more general way to this employment relationship. The Second Circuit said that's not enough. So as liberal as the standard may be, you know, it doesn't cover things that are fundamentally about different factual circumstances. The facts of the one don't really relate to another. Here you have on one hand what the Mosifer claims are bringing are as a claim of a disinformation conspiracy. You know, whether, you know, those claims will go forward or not, we don't take a position on. But they are about, you know, an allegation that Mr. Brody was engaged in disinformation that harmed the Mosifer company's business. The counterclaims that the Brody parties have now brought against Qatar are about alleged cyber espionage. I can't think of a single fact that would be relevant to litigating the Mosifer party's claim that would go to the elements of any cause of action that the Brody parties are bringing against Qatar. These are fundamentally two different things, an alleged disinformation conspiracy and alleged actions of cyber espionage. I would just point out, you know, this is a, you know, I think there is good reason to be cautious about the same transaction or occurrence analysis in the context of the counterclaim exception where Congress has proceeded carefully and narrowly in making exceptions to the general rule of sovereign immunity for foreign sovereigns. Even if though we assume that this applies exactly the same way it does in the Rule 13 standard, there's actually real danger in, you know, setting aside foreign sovereign immunity, just the way litigation works in a more normal setting to adopt this kind of limitless, you know, any circumstance that kind of, you know, connects the two parties even if the two claims, the claims and the counterclaims don't have any factual overlap. The result of that would mean if you don't bring a counterclaim that you might have a totally separate dispute with the same person. If you don't bring that counterclaim, it would be treated as compulsory and you would lose that in another action. So, the point of this rule is judicial efficiency and if something is going to be, you know, the same basic set of facts are going to be litigated in one case, they should be litigated, you know, the counterclaim should be litigated too. If you adopted, you know, what the Broygate parties are asking for here, totally separate from the consequences for sovereign immunity, it would have real problems for litigation more broadly. Your Honor, I'm happy to yield the rest of my time unless there are questions. Okay. Thank you very much. Okay. Mr. Larsen. You have two minutes. Thank you. Thank you, Your Honors. I'll just make four points of rebuttal. First of all, with respect to the initial, the anti-slot matter, Mr. Saunders is wrong. The Planned Parenthood case, yes, did extend to Step 2, but the gun case, which we submitted that just came out this year, made it clear that it applies to both Step 1 and Step 2. At page 1120, the court wrote, we now hold that these rules for anti-slap motions to strike apply in federal courts, regardless of whether a plaintiff challenges the first or second step of the anti-slap analysis. This was a legal motion. It was not a factual challenge. Therefore, the court had to accept as true, just as it does in every 12B situation, the factual allegations. We clearly pled that it was illegal conduct. It clearly is illegal conduct, and therefore it was improvident, improper to grant the anti-slap. Second point on the UCL. It is clearly conduct that is subject to the UCL. This is illegal lobbying and public relations, which is designed to disrupt commercial relations, designed to destroy our clients' business, designed to strip them of money. This is using a political instrument, lobbying, politics, publications, etc., but for a purpose that is contrary to the UCL, and is in violation of federal criminal law. That takes it outside of protected speech. That is clearly aimed at disrupting commercial success of a business. It's also a business practice to take money to make publications. There's no question here that this is a business practice. Counsel is correct that not all political activity equals business, but in this case, this quasi-political activity, this illegal conduct, is designed. It is unfair competition. It is wrong. There may not be any cases which specifically say that FERA is a basis for UCL, but there is no case out there which says that FERA cannot be the basis for UCL. In that kind of conduct, there's no authority that FERA stands apart from any other statute and can't be used as a UCL predicate. In the context of this... Is there a time that this is the final point you want to make? Well, the final point is just on the issue of the statute of limitations with respect to the fraudulent statement claim. That is all wrapped up in the fraudulent concealment that was being perpetuated precisely in violation of the FERA statute. That's a factual issue. This was not the time to decide the statute of limitations. All of this needs discovery. It is a proper subject for in motion for summary judgment, not for a decision at the 12-day stage. Reinstate those two claims. Overturn the anti-slap. And let this case go forward as it should. Thank you, Your Honors. Great. I just want to ask one last question for the Court's indulgence. The gun case that Mr. Larson just referenced was a factual challenge, not a legal one. It had nothing to do with Planned Parenthood. It had nothing to do with the illegal conduct exception. Again, just not relevant to the issues that are before this Court. Just briefly addressing the abusive process counterclaim and the RICO counterclaim, both of which the District Court wrongly dismissed. On abusive process, we cite at least two California cases, the Barquis and You case, where the filing of a lawsuit was held to support an abusive process claim where the lawsuits were allegedly filed in an improper venue to try to get default judgments. Same thing here. The only difference is that instead of trying to abuse the process through filing in an improper venue, we have the counterclaim defendants trying to abuse the process through filing in the name of improper proxies. In both cases, it's a misuse of the process for an end other than what it was defined to accomplish, which is the gist of the abusive process court. On the RICO claim, and I'll ask the Court maybe for an additional 30 seconds. Thank you. The District Court found that the boarding parties had not adequately pleaded how initiating the lawsuit was tortious or unlawful, and it said, we had not provided adequate notice that the issuance of a press release was one of the predicate acts. That's at ER 2627. We believe there are sufficient allegations in the complaint to support that. We've discussed that in our brief. But to the extent that anything was unclear or constituted inadequate notice, that's precisely the kind of thing that can be made clear through amendment. And the boarding parties asked for leave to amend. That leave is supposed to be granted with extreme liberality, and the District Court abused its discretion in denying the boarding parties even a single attempt to try to amend its RICO claim or to substitute a claim for RICO conspiracy, both of which were specifically requested. Thank you, Your Honor. Thank you very much. Thank you, Your Honor. Your Honor, first, the counsel mentioned the Cabrieri case. That's completely unlike this case, and, if anything, shows why the exception applies here. In that case, an employee of Ghana living in the United States, Ghana, sought to evict an employee of its government in the United States from premises that it owned. He sought to bring counterclaims arising from claims that he was tortured while back in Ghana. Well, everything that the core issue here in the claims, in Mosifer's claims and in the counterclaims, is Mr. Roydy's criticism of Qatar and Qatar's retaliation for that. Counsel ignores the allegations of the counterclaims. We are not claiming that Mosifer was bringing claims on behalf of Qatar in the sense that it was asserting these trade, you know, unfair trade claims, for example, on behalf of Qatar. We are asserting, and, again, I think it's plain and the inference is clear, that they were bringing it as part of Qatar's campaign to retaliate, a lawfare campaign to retaliate against U.S. citizens exercising their First Amendment rights while remaining free from counterclaims. And this is a road, and if Qatar is allowed to do this, this will provide a road map for foreign countries to continue to do this. And it's not justified under the statute under the FSIA. Counsel argues that that relies heavily on their brief, and said today that Qatar is an important language. Well, it's important, but often lawyers bring claims on behalf of clients. Trustees bring claims on behalf of trusts. Guardians bring claims on behalf of others. And finally, just one more. The argument that the same transaction or occurrence would be limitless under our argument is false. This case is unprecedented because no country, to my knowledge, has tried to do that or has been challenged in doing that. But, again, Your Honors, if we're not allowed, permitted to assert counterclaims against Qatar under these circumstances, I think it will come back to haunt us, and it will damage our First Amendment. Thank you. Thank you very much. We thank all counsel for their arguments today, very helpful. And this case is now submitted.
judges: PAEZ, THOMAS, Collins